**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4667-11T1
                     A-4787-11T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent/
Cross-Appellant,

v.

DHARUN RAVI,

     Defendant-Appellant/
Cross-Respondent.

_____

**APPROVED FOR PUBLICATION**

**September 9, 2016**

**APPELLATE DIVISION**

Argued February 3, 2016 – Decided September 9, 2016

Before Judges Fuentes, Kennedy and Gilson.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 11-04-00596.

Steven D. Altman argued the cause for appellant/cross-respondent (Benedict and Altman, and Gibbons, P.C., attorneys; Lawrence S. Lustberg and Amanda B. Protess, of counsel; Mr. Altman and Philip Nettl, on the briefs).

Joie D. Piderit, Assistant Prosecutor, argued the cause for respondent/cross-appellant (Andrew C. Carey, Middlesex County Prosecutor, attorney; Susan L. Berkow, Assistant Prosecutor, of counsel and on the briefs).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

On April 20, 2011, a Middlesex County grand jury returned Indictment No. 11-04-00596 charging defendant Dharun Ravi as follows: Count 1, fourth degree invasion of privacy, occurring on September 19, 2010, with regard to T.C. and M.B., contrary to N.J.S.A. 2C:14-9(a); Count 2, third degree bias intimidation, occurring on September 19, 2010, with regard to T.C. and M.B., contrary to N.J.S.A. 2C:14-9(a) and N.J.S.A. 2C:16-1(a)(1) and (2), and with regard to T.C., contrary to N.J.S.A. 2C:14-9(a) and N.J.S.A. 2C:16-1(a)(3)(b); Count 3, third degree invasion of privacy, occurring on September 19, 2010, with regard to T.C. and M.B., contrary to N.J.S.A. 2C:14-9(c); Count 4, second degree bias intimidation, occurring on September 19, 2010, with regard to T.C. and M.B., contrary to N.J.S.A. 2C:14-9(c) and N.J.S.A. 2C:16-1(a)(1) and (2), and with regard to T.C., contrary to N.J.S.A. 2C:14-9(c) and N.J.S.A. 2C:16-1(a)(3)(b); Count 5, fourth degree attempted invasion of privacy, occurring on September 21, 2010, with regard to T.C. and M.B., contrary to N.J.S.A. 2C:14-9(a) and N.J.S.A. 2C:5-1; Count 6, third degree bias intimidation, occurring on September 21, 2010, with regard to T.C. and M.B., contrary to N.J.S.A. 2C:14-9(a), N.J.S.A. 2C:5-1, and N.J.S.A. 2C:16-1(a)(1) and (2), and with regard to T.C., contrary to N.J.S.A. 2C:14-9(a), N.J.S.A. 2C:5-1, and N.J.S.A. 2C:16-1(a)(3)(b); Count 7, third degree attempted

invasion of privacy, occurring on September 21, 2010, with regard to T.C. and M.B., contrary to N.J.S.A. 2C:14-9(c) and N.J.S.A. 2C:5-1; Count 8, second degree bias intimidation, occurring on September 21, 2010, with regard to T.C. and M.B., contrary to N.J.S.A. 2C:14-9(c), N.J.S.A. 2C:5-1, and N.J.S.A. 2C:16-1(a)(1) and (2), and with regard to T.C., contrary to N.J.S.A. 2C:14-9(c), N.J.S.A. 2C:5-1, and N.J.S.A. 2C:16-1(a)(3)(b); Count 9, fourth degree tampering with physical evidence, occurring on September 22, 2010, contrary to N.J.S.A. 2C:28-6(1); Count 10, fourth degree tampering with physical evidence, occurring on September 22, 2010, contrary to N.J.S.A. 2C:28-6(2); Count 11,[1] third degree hindering apprehension or prosecution, occurring on September 22, 2010, contrary to N.J.S.A. 2C:29-3(b)(1); Count 12, third degree hindering apprehension or prosecution, occurring on September 23, 2010, contrary to N.J.S.A. 2C:29-3(b)(3); Count 13, third degree hindering apprehension or prosecution, occurring on September 23, 2010, contrary to N.J.S.A. 2C:29-3(b)(4); Count 14, third

---

[1] Prompted by the trial judge's sua sponte comments, the State moved to amend the indictment to relabel the hindering apprehension charge -- on counts 11 and 13 under N.J.S.A. 2C:29-3(b)(1) and (4) -- from a third degree offense to a fourth degree offense. Count 12 was amended to a second degree offense. The trial judge granted the State's motion and denied defendant's motion to dismiss all of the hindering counts as inconsistent with the tampering counts.

degree witness tampering, occurring on September 23, 2010, contrary to N.J.S.A. 2C:28-5(a)(1) and/or (2); and Count 15, fourth degree tampering with physical evidence, occurring between September 19 and 23, 2010, contrary to N.J.S.A. 2C:28-6(1).

Both parties engaged in extensive pretrial motion practice.[2] Defendant was eventually tried before a jury over a period of sixteen days. On March 16, 2012, the jury found defendant guilty on all fifteen counts in the indictment, although not on every charge reflected in each count.[3] Defendant made a motion for a new trial. The motion was heard both in open court and at sidebar, because part of defendant's arguments concerned M.B. The court ultimately denied the motion for a new trial.

On May 21, 2012, the trial judge sentenced defendant to an aggregate three-year probationary term, conditioned upon serving thirty days at the Middlesex County Adult Correctional Center.

---

[2] Given the media attention this case received, the State sought to protect the privacy of M.B. by keeping all information pertaining to his identity confidential. The court granted defendant's motion seeking supplemental discovery on M.B., but denied a motion seeking to unseal records pertaining to his identity. We denied defendant's interlocutory motion for leave to appeal the trial court's decision.

[3] The verdict sheet required the jury to determine defendant's guilt on thirty-five individual charges originally contained in the fifteen counts of the indictment. The jury found defendant guilty of twenty-one of the thirty-five charges.

The judge also ordered defendant to complete 300 hours of community service, attend counseling on cyber-bullying and alternate lifestyles, and pay an assessment of $10,000, which would be allotted to a state-licensed or state-chartered community-based organization dedicated to providing assistance to victims of bias crimes.

Defendant appeals his convictions. The State has filed a cross-appeal challenging the legality of the probationary sentence imposed by the trial judge. The State points out that defendant was convicted of two counts of second degree bias intimidation and one count of second degree hindering apprehension in violation of N.J.S.A. 2C:29-3(b)(3). These three convictions carry a presumption of incarceration pursuant to N.J.S.A. 2C:44-1(d). The State argues the trial judge failed to follow the standard established by the Supreme Court in State v. Evers, 175 N.J. 355, 389-95 (2003), in imposing a probationary sentence on these offenses.

We are satisfied that the outcome of this appeal comes down to a careful application of our Supreme Court's analysis and holding in State v. Pomianek, 221 N.J. 66, 69 (2015), which declared N.J.S.A. 2C:16-1(a)(3) unconstitutional because it allowed a jury "to convict a defendant even when bias did not motivate the commission of the offense." Here, the jury found

defendant guilty on four counts directly predicated on N.J.S.A. 2C:16-1(a)(3), a now constitutionally defunct law. Indeed, the prosecutor conceded at oral argument before this court that the convictions under counts 2, 4, 6, and 8 are void as a matter of law pursuant to Pomianek. Thus, these four charges against defendant must be dismissed with prejudice.

After carefully reviewing the record developed at trial, it is clear that the evidence the State presented to prove the bias intimidation charges under N.J.S.A. 2C:16-1(a)(3) permeated the entire case against defendant, rendering any attempt to salvage the convictions under the remaining charges futile. The State used evidence revealing the victim's reserved demeanor and expressions of shame and humiliation as a counterweight to defendant's cavalier indifference and unabashed insensitivity to his roommate's right to privacy and dignity. The prosecutor aggressively pressed this point to the jury in her eloquent closing argument.

It is unreasonable to expect a rational juror to remain unaffected by this evidence. In light of the Court's ruling in Pomianek, admission of T.C.'s state of mind evidence constituted an error "of such a nature to have been clearly capable of producing an unjust result." R. 2:10-2. Finally, independent of this overarching error, we conclude that defendant's

conviction on Count 12, charging him with second degree hindering apprehension in violation of N.J.S.A. 2C:29-3(b)(3), must be vacated and the charge against him dismissed with prejudice as a matter of law for insufficiency of the evidence. R. 3:18-1.

I

Defendant graduated from high school in June 2010 with plans to attend Rutgers University in the fall. On August 6, 2010, he received an email from Rutgers directing him to the housing application website where he learned that he had been assigned a dorm room in Davidson Hall C on the Busch Campus. The website also disclosed that T.C. would be his roommate and provided his contact information. Defendant asked his friend J.T.[4] to suggest other Internet-related ways to find out more information about T.C.

This "conversation" between J.T. and defendant took place in an instant-message[5] format. With J.T.'s help, defendant

---

[4] We use initials for witnesses to protect their privacy interests. R. 1:38-3(c).

[5] Instant messaging (IM) is an on-line electronic text message system "whereby participants are on-line at the same time and communicate with each other in 'real time,' as if they were talking on the phone." Jorge Amieva, Legal Advice Given Over the Internet and Intranet: How Does this Practice Affect the Lawyer-Client Relationship?, 27 RUTGERS COMPUTER & TECH. L.J. 205, 218-19 (2001).

learned that T.C. had an interest in the violin and that someone using T.C.'s email address had posted on a gay forum. This last discovery prompted the following response from defendant: "FUCK MY LIFE. He's gay."

Defendant's friend, S.X.,[6] testified that defendant had "googled" T.C.'s name and found that T.C. had a "posting on a gay forum and therefore he inferred that [T.C.] was homosexual." On cross-examination, S.X. testified that defendant did not discuss the topic of homosexuality during high school. Defendant also did not say "anything about disliking homosexuals." While in high school, S.X. and defendant were members of the Ultimate Frisbee Club. Both S.X. and defendant continued this activity at Rutgers by joining the Rutgers Ultimate Frisbee Club.

A.C. was also defendant's high school friend. He corroborated S.X.'s testimony concerning defendant's attitude or disposition about homosexuality. A.C. stated defendant had never said anything anti-gay, but acknowledged the subject was not one they normally discussed. Defendant told A.C. in August 2010 that his roommate was gay, but A.C. characterized this as

---

[6] S.X. attended the same high school as defendant and both graduated in 2010. They also enrolled at Rutgers' Busch Campus. S.X. resided at Highland Hall. S.X. testified at trial as part of the State's case in chief.

merely a part of a casual conversation.

Defendant moved into his dorm room on August 28, 2010; his high school classmate M.W. resided in the room directly across the hall. Defendant and M.W. became friends and started socializing and "hanging out together." M.W. testified that defendant "mention[ed] early on that he thought [T.C.] might be gay[.]" She characterized this as a very brief casual remark that "didn't come again." M.W. never thought that defendant bore any animosity toward T.C. or otherwise resented him for being gay; rather, she believed that T.C. and defendant merely had different personalities. She described T.C.'s demeanor as quiet and reserved. Thus, although she lived across from him, M.W.'s interactions with T.C. were limited to saying "hi" in the hallway.

A

September 19, 2010 Incident

M.W. testified that during an instant-message conversation with defendant at 9:06 p.m. on Sunday, September 19, 2010, she invited defendant to come to her room for a snack. Defendant agreed. When the prosecutor then asked M.W. to tell the jury what defendant told her when he came over to her room, M.W. responded:

> I'm not sure if this happened right when he came into my room or maybe a little later

on, but he told me eventually that when he went into his room he wanted to -- I think his roommate asked him if he could have the room for a period of time.

Defendant told M.W. that as he was about to leave the room, T.C. made it clear that he wanted the room to himself, and that defendant should not return "for a while." M.W. testified that defendant left her room briefly, but returned after he saw "a guest that [T.C.] was having over." Defendant described the guest as "an older-looking man . . . I guess not a college-age student-looking kind of guy . . . just like an older, shabbier-looking guy." M.W. testified that defendant left her room again for a brief period of time.

PROSECUTOR: And what happened when he came back to your room at that time?

A. By that time he had set up his computers so that -- or I guess it's his computer to basically auto accept if anyone wants to video chat with him, and he explained to me that he could see what was going on in his room if somebody else -- if he called his computer from someone else's computer.

PROSECUTOR: That he would be able to see what was going on in his room?

A. Yes.

PROSECUTOR: Now, you said the words automatically accept. Did you know anything about that before he mentioned it to you?

A. No.

PROSECUTOR: And did you know that he could even do that?

A. No.

As M.W. sat by her computer, defendant opened the chat box, selected his own name, and clicked on the video button. An image of T.C. and his guest appeared on the screen. M.W. testified that she saw the two men kissing. Although the room was dark, she was able to see that they were standing and were fully clothed. M.W. testified that the video feed was open "very, very brief[ly]. Like two seconds or less. We closed it. I'm not sure who closed it first, but we closed it."

M.W. testified that she and defendant "were both just kind of like really shocked. . . ." According to M.W., their initial reaction was to keep what they had seen to themselves and not tell anyone what happened. In M.W.'s words: "[I]t was just very shocking."

PROSECUTOR: Now, why did you talk about not telling anyone what had just happened?

A. Just because, it was -- like it shouldn't have happened and we saw something that we didn't expect to see and . . . it just felt weird.[7]

M.W. walked away from her computer and sat on her bed. She

---

[7] On cross-examination M.W. explained that "this was [her] first experience seeing two males kissing[.]"

A-4667-11T1

testified that defendant continued using her computer to "AIM [chat]" with a mutual friend. M.W. also believed that defendant went on Twitter. A screenshot[8] of defendant's Twitter captured the following tweet: "Roommate asked for the room till midnight. I went into [M.W.'s] room and turned on my webcam. I saw him making out with a dude. Yay."

M.W. later engaged in an instant-message conversation with her boyfriend from high school who was attending Stevens Institute of Technology at the time. A screenshot of their chat showed that M.W. told A.C., "[T]he craziest thing . . . just happened;" defendant then typed: "My roommate asked for the room till midnight. And I was like wtf.[9] But whatever I said okay and I left and I went into [M.W.'s] room and I turned on my webcam from there. And I saw him making out with some dude."

C.C. was M.W.'s roommate. She was in the dorm lounge at around 9 p.m. when she saw T.C. enter the building, accompanied by a man whom she had not seen before. She described the man as having an "Italian look about him." He had dark hair and a goatee, and he looked older than the typical college student, but "not obscenely old." In response to the prosecutor's

---

[8] A "screenshot" is a snapshot image of the information displayed on a computer screen at a given point in time.

[9] "Wtf" stands for "what the fuck."

questions, C.C. estimated that he appeared to be in his "late 20's, early 30's." T.C. and the man walked in the direction of the dorm rooms. Thereafter, C.C. remained in the dorm lounge for approximately twenty minutes before she decided to return to her room.

When C.C. walked into her room, she saw M.W. chatting on her computer and defendant reading over her shoulder saying: "No, no, tell them not to call my vid chat." When she was later questioned by law enforcement officers about this particular incident, C.C. explained that she inferred defendant did not want other persons to access the chat and see "what was going on." Defendant informed C.C. of his sneaking suspicion that T.C. was gay, but he told her that he "was not sure about it." C.C. testified that defendant "wanted to find out for sure." He used his video chat to see if T.C. and his guest "were like friends chilling" or else "making out and like having interactions of that sort." However, C.C. also testified that defendant "didn't have an issue with homosexuals and that in fact he had a really good friend that [sic] was homosexual[;] he had no issue with him at all."

Defendant and C.C. left M.W.'s room and went to the dorm lounge. Defendant came up to his friend A.A. and told him he had "a secret." A.A. described defendant's demeanor at the time

A-4667-11T1

as "distraught." According to A.A.'s testimony, defendant told A.A. that his roommate, T.C., "had just invited a guy over and asked for the room, for it to be his that night." Although he did not know T.C., A.A. claimed that he "went along with saying [']oh, wow, that's pretty crazy and scandalous[.']" A.A. claimed that he did not say these things because T.C. "invited another male to the room[.]" The only part of defendant's revelation A.A. found "scandalous" was the description of the "guy who was invited over as someone older[.]"

C.C. told P.K., K.N., and R.M. about seeing T.C. "making out" with a man in his dorm room through defendant's video chat. Defendant, C.C., A.A., P.K., K.N., and R.M. all returned to M.W.'s room to continue talking about T.C. and his guest. C.C. testified that she, P.K., K.N., and R.M. were curious about what was going on in T.C.'s dorm room and wanted to see the video. C.C. in particular noted that T.C. "wasn't out to the public about being gay or anything, so it was kind of like, [']I wonder if it is true[,'] or, you know, just out of curiosity."

M.W. initiated the link to defendant's computer. C.C. testified that "the video was only about a second long." She gave the following description of what she saw:

> A. It came up first, but for a second there was a quick video and you saw two males leaning up against the bed making out.

Q. And could you actually see that?

A. Yes.

Q. Okay. Could you tell who the two males were?

A. I couldn't tell specifically, but through logic I determined that one was [T.C.] and one being the other male that accompanied him into the building.

Q. When you say logic, why do you say that?

A. Because I know that [defendant] had a desktop, so that would be where his video camera would have been stationed, and the other -- the only other person with access to the room would be [T.C.] and I knew that he had asked for the room during this period.

Q. How did you know that [defendant] had a desktop? . . . [W]hat do you mean by [desktop]? . . . .

A. Like a monitor just like that and like a modem on the floor, on the side.

Q. How did you know that?

A. With [defendant], through walking by the room and also I believe it came up in conversation once or twice.

Q. Conversation with [defendant]?

A. Or with [M.W.], with someone that knew.

Q. And when you saw the image on the screen did it appear to be a picture or a live image?

A. A live image.

15                                          A-4667-11T1

Q. And when you say [there] were the two males that were kissing, . . . could you tell whether they had clothes on or no clothes on?

A. I could only really see one of them and his back was to the camera and he appeared to be shirtless.

Q. And what happened after that, after you saw that image?

A. Someone pressed none tweeted abruptly, and we said okay, that happened and that was the end of that (sic).

[(Emphasis added).]

M.W., K.N., R.M., P.K., and "maybe" defendant were in the room with C.C., and using M.W.'s laptop computer to view the foregoing surreptitious images. C.C. later claimed that M.W. was the one who "abruptly" stopped the transmission. When the prosecutor asked C.C. if anyone said anything to cause M.W. to shut it down, she answered, "I can't recall to be honest."

P.K. testified that it was M.W. who encouraged them to watch the live video transmission. P.K.'s description of the images she viewed corroborated C.C.'s account in all but one material detail. According to P.K., the video transmission was terminated after about five seconds. The female students told defendant what they had seen when he returned to the room. P.K. testified that defendant was not particularly bothered by what he heard. In P.K.'s words: "He was just okay." He told them he

did not have a problem with T.C. being gay.  P.K. returned to the dorm lounge.  She later saw T.C. come out of his room with his guest.  She described the man as being approximately thirty years old, and thus viewed him as "very old."  Defendant returned to M.W.'s room around midnight and fell asleep in her chair until about 2:00 a.m., at which point he returned to his own room.

B

September 21, 2010 Incident

At approximately 5:30 p.m. on Tuesday, September 21, 2010, defendant texted M.W. the following message: "Its (sic) going down tonight also."  M.W. inferred from this cryptic text message that T.C. had again asked defendant to have the dorm room for himself. M.W. responded: "wtf again (sic), I'm worried about you lol[.]"[10]  Defendant replied, "I'm gonna [sic] be at practice anyway."

A.Ag. met defendant shortly after she moved into Davidson Hall C; they soon became friends.  She received the tweet defendant sent on Sunday night (September 19, 2010) saying that he saw his roommate "making out with a dude."  When the prosecutor asked her to explain what the tweet meant to her, she responded: "It didn't faze me . . . as much as it should have.

---

[10] "Lol" stands for "laughing out loud."

I really didn't think much of it. I don't even remember at the time if I knew of [T.C.'s] sexual orientation, so it just really didn't faze me." A.Ag. received another tweet from defendant on Tuesday September 21, 2010, that said: "<u>Anyone with iChat I dare you to video chat me between the hours of 9:30 and 12. Yes, it's happening again</u>." (Emphasis added).

Later on that Tuesday evening, defendant explained the auto-accept feature on his computer to A.Ag. and other friends, encouraging them to video chat him between 9:30 p.m. and midnight. Defendant went to A.Ag.'s room after dinner and used her computer to video chat with his computer. A.Ag. testified that she saw an image appear on her screen, which showed T.C.'s side of the dorm room and T.C.'s bed. A.Ag. and defendant left the dorm together at approximately 8:30 p.m.; defendant went to practice with the Ultimate Frisbee Club.

Sometime after 10 p.m., defendant went to A.Ag.'s dorm room to show her the new cleats he had purchased. According to A.Ag., defendant stayed in her room and helped her with her calculus homework for the next couple of hours. A.Ag. testified that defendant rarely spoke about T.C., and that he never made any derogatory remarks during the few occasions on which T.C. did come up in conversation. A.Ag. also testified that defendant did not seem in any way upset that T.C. was gay. She

described defendant as "absurd" and being his "crazy goofy self."

L.O., another friend defendant made after arriving at Rutgers, saw defendant in the dorm lounge around 6:30 p.m. on the evening of Tuesday, September 21, 2010. Defendant told L.O. that the events from Sunday night were happening again, and he asked if he could use L.O.'s computer to remotely activate the webcam on his own computer. The two of them went to L.O.'s room. Defendant initiated an iChat from L.O.'s computer, thereby activating the webcam on his own computer in his dorm room. When an image of defendant's room appeared on the screen, defendant explained the auto-accept feature to L.O. Defendant then went to his room and told L.O. to check the angle on the webcam. L.O. testified that he saw defendant walk around his room and move his computer until T.C.'s bed came squarely into view. Defendant then returned to L.O.'s room, grabbed his bag, and left.

L.O. also left to attend an evening class, but returned to his room around 9:30 p.m. Remembering what defendant said was happening, he clicked on defendant's video chat "thinking that I would maybe get a glimpse." An error message came up, however, and he could not connect to defendant's webcam. L.O. saw defendant in the lounge around 11:00 p.m. and told him that the

video did not work. Defendant replied: "Yeah, I've been getting that from a lot of people." L.O. testified that defendant had never made any disparaging comments or homophobic remarks about T.C. In fact, L.O. claimed defendant described T.C. as "a nice guy." However, L.O. recalled that defendant genuinely seemed shocked when he told him about what he had seen T.C. doing on the previous Sunday evening.

A.A. also saw defendant on Tuesday evening, September 21, 2010. Defendant told A.A. that T.C. had asked for the room that night and commented: "[T]hey're at it again." Defendant wondered where he would sleep if T.C.'s guest was going to be there the entire night; he was also not sure he wanted to go back to the room anyway.

S.X. was also a member of the Rutgers Ultimate Frisbee Club. He testified that defendant told him about what had happened on Sunday while they were at the Tuesday evening practice. Defendant told S.X. that T.C. had asked for the room again that night. S.X. testified that defendant was very knowledgeable about computers. He liked to brag about what he could do to people using his computer. That Tuesday, he told team members that he had set up his webcam to view T.C.'s expected homosexual encounter, and he explained how they could watch the interaction from their own computers.

G.I. was the captain of the Rutgers Ultimate Frisbee Club. Defendant had spoken to him about T.C. on multiple occasions specifically mentioning that he suspected that T.C. might be gay. Based on defendant's demeanor, G.I. believed defendant was "uncomfortable with the situation." G.I. made clear, however, that defendant never said anything disparaging or malicious about T.C.

After the Frisbee Club completed its Tuesday night practice, defendant, G.I., and a few other teammates went to the cafeteria. While they were waiting for their food, defendant told them that he had set up a webcam to capture images of his roommate and his roommate's male guest. Defendant told them that he had done it before and that he intended to do it again that evening.

M.H., a high school classmate of defendant, was attending Cornell University in the fall of 2010. She kept in touch with defendant through Facebook, iChat, Twitter, and text messaging. She had seen defendant's tweets from Sunday, September 19, 2010, and Tuesday, September 21, 2010; M.H. and defendant discussed the content of these electronic messages in a series of texts starting on September 21, 2010. M.H. gave law enforcement investigators permission to photograph the messages on her phone; she also identified and authenticated them at trial.

On September 21, 2010, at 1:46 p.m., M.H. and defendant engaged in the following electronic exchange via text messages. We quote the text messages verbatim, without noting any grammatical deviations or spelling errors:

> M.H.: hahahahha your gay roomie that. . . did you really see him make out with some guy lmao[11]
>
> DEFENDANT: Yeahh omg[12] [M.W.] saw it too. He was older and creepy and def from the internet

The following exchange then took place:

> M.H.: that's so nastyyy ew watch out he might come for you when you're sleeping!
>
> hahaha jk
>
> DEFENDANT: Omg everyone keeps telling me that. I haven't seen him since then
>
> M.H.: hahaha good luck with thatt
>
> DEFENDANT: He just texted me asking when I was coming home omg.
>
> M.H.: maybe his gay friend is in your Ed
>
> bed*
>
> DEFENDANT: I set my computer to alert me if anyone is in it when I'm not there LOL
>
> M.H.: really?? how lmao that's so cool

---

[11] "Lmao" stands for "laughing my ass off."

[12] "Omg" stands for "oh my God."

DEFENDANT: My webcam checks my bed hahaha.
I got so creeped out after sunday

M.H.: hahaha that's so crazy

DEFENDANT: Yeah keep the gays away

M.H.: I saw a lesbian Asian couple today

but they were like nerdy fobby asian and it
was gross

DEFENDANT: Ewwww.  When we were in ny we saw
two guys making out on a stoop

M.H.: NY that's pretty normal though hahha
one of my friends is this gay Asian guy who
has his ear pierced lol

I mean bellybutton pierced*

Later, at 6:41 p.m. on September 21, 2010, defendant texted M.H. the following: "Do it forreal I have it pointed at his bed. And the monitor is off so he can't see you."  When M.H. asked how defendant could accept the video chat, he replied:  "It's set to automatically accept.  I just tested it and it works lol[.]"  At 7:03 p.m. defendant texted: "Be careful it could get nasty . . . Mad people are gonna do it[.]"  At 8:41 p.m. he texted:  "Omfg[13] people are having a viewing party with a bottle of bacardi and beer in this kids room for my roommate." (Emphasis added).  M.H. testified that she did not attempt to video chat defendant on Tuesday.  On September 22, 2010, she

---

[13] "Omfg" stands for "Oh my fucking God."

23

texted defendant, "I didn't do it.  How was it last night?  Hahaha."  Defendant replied, "It got messed up and didn't work LOL."

<u>C</u>

<u>M.B.</u>

M.B. was the man who visited T.C. on September 19 and 21, 2010.  He met T.C. towards the end of August 2010 on a social networking site for gay men.  He was thirty years old at the time.  M.B. and T.C. communicated for a couple of weeks through email, instant messaging, and texting before arranging to meet at T.C.'s dorm room.  They met for the first time on Thursday, September 16, 2010.  At first, M.B. called T.C. to meet him on the street because M.B. had difficulty finding Davidson Hall.  T.C. took him to his room around 10:00 p.m., and M.B. stayed until 2:00 a.m.

M.B. next met T.C. on Sunday, September 19, 2010.  He arrived around 9:30 p.m. and T.C. again took him to his room.  Defendant was in the room when T.C. and M.B. arrived.  M.B. testified that he said "a quick hi" to defendant; "I really wasn't engaging him in any conversation or anything."  T.C. did not make any attempt to introduce M.B. to defendant.  M.B. testified that defendant left the room but "came back rather quickly."  On cross-examination, M.B. stated that T.C. locked

the door as soon as defendant left the room. Defendant knocked on the door "five to ten seconds" later, requiring T.C. to unlock and open the door. Defendant went to his desk, shuffled "some papers" around, and walked out. He did not return.

M.B. initially testified that he was in T.C.'s room for about two hours. However, he later acknowledged that surveillance cameras in the dorm hallway showed he was there only for approximately forty-five minutes. M.B. had "sexual relations" with T.C. In response to defense counsel's questions on cross-examination, M.B. stated that both T.C. and he were naked, and that the "sexual relations" involved "sexual contact and sexual penetration." Defense counsel asked M.B. if he had "any other recollection about anything that might have occurred on that night before [he] left[.]" M.B. gave the following response:

> Well, . . . while we were intimate together on the bed[,] I had just glanced over my shoulder and I had noticed that there was a webcam that was faced towards the direction of the bed[,] and I just thought it was kind of strange, you know, just being in a compromising . . . position [and] seeing a camera lens. I guess it just stuck out to me that . . . if you were sitting at a desk using that computer, that camera wouldn't be facing that direction. It would be facing towards the person using the computer.

M.B. clarified that he did not make this observation when he first came into the room.

When M.B. left the dorm building that night, he saw a group of five people standing in a corner and looking at him. He described the experience as "unsettling." He "felt uncomfortable because they were staring at me and they were looking at me in an odd way." He saw T.C. again on Tuesday, September 21, 2010. This time, there was no one else in the dorm room. They again engaged in "sexual relations." In the course of cross-examination, M.B. also confirmed that he did not see "anything pointed out to [him]." When asked to clarify, M.B. stated, "[F]rom the experience on the 19th . . . I didn't see the webcam on top of the computer." M.B. testified that he did not know what had happened to T.C. until he read about it in the newspaper. This was also the time that he learned T.C.'s last name.

D

T.C.

A forensic examination of T.C.'s computer performed by Gary Charydczak, an Investigator with the Middlesex County Prosecutor's Office, revealed that T.C. visited defendant's Twitter account fifty-nine times between September 13, 2010, and September 22, 2010. T.C. captured several screen shots of defendant's tweets, including defendant's September 19, 2010, tweet that stated defendant had seen T.C. "making out with a

dude," and defendant's September 21, 2010, tweet daring "people to video chat [him] between 9:30 [p.m.] and 12 [a.m.]."

At 3:55 a.m. on September 21, 2010, T.C. submitted a room change application to Rutgers' Residence Life Assignments Office. In the section of the application requiring to state the reason why he wanted a single room, T.C. wrote: "roommate used webcam to spy on me/want a single room." Raahi Grover, a residence assistant at Davidson Hall C, testified that he interacted with defendant at social gatherings and spoke to him in the hallway and in the dorm lounge.

On the other hand, Grover knew T.C. "strictly by face." The only time he spoke to him was at 11 p.m. on September 21, 2010. Grover testified that he was alone in his dorm room when T.C. knocked on the door. Grover further testified that he could tell from the tone of T.C.'s voice that he was uncomfortable. He thus asked T.C. to come inside and closed the door to allow him to speak freely in private. T.C. told Grover about an incident involving defendant. Based on T.C.'s account of what had allegedly occurred, Grover decided that the matter required the involvement of senior management.

Grover asked T.C. to send him an email describing the situation. Grover told T.C. that he would use the information disclosed in the email to file an incident report in Rutgers'

internal information sharing system called "Symplicity." As Grover explained, "That report is accessible to Senior Management who will take actions based on what the report has in it." Grover also extended T.C. an invitation to stay on an extra bed in his room if T.C. felt uncomfortable returning to his own dorm room. T.C. declined. Surveillance footage shows that T.C. was in Grover's room for approximately five minutes.

Grover characterized the matter as a "roommate conflict" in the Symplicity incident report he filed. Under the heading of "incident description," Grover wrote: "A resident in Davidson C, [T.C.], approached me today (9/21/2010) at 11:00 PM to discuss an issue on a violation of privacy against his roommate, Dharun Ravi. [T.C.] has took [sic] the liberty to write an email describing the incident." Grover then quoted the email sent to him by T.C. in full. The trial court redacted this document to delete some of the hearsay information reflected in T.C.'s email.

The final document the jury received in evidence contains the following statement written by T.C.: "I feel my privacy has been violated and I am extremely uncomfortable sharing a room with someone who would act in this . . . manner." The report continued with this statement written by Grover: "[T.C.] is quite upset and feels uncomfortable. [T.C.] prefers a roommate

28

switch ASAP and would like to see some sort of punishment for Dharun Ravi."

On the afternoon of Wednesday, September 22, 2010, Grover notified defendant regarding T.C.'s allegations that defendant had violated his privacy. Based on the information provided by T.C., a formal incident report had been filed and defendant was informed that he should expect to hear from senior management about the matter. After speaking with Grover, defendant accessed his Twitter account and deleted the September 19 and 21, 2010 postings concerning T.C. Defendant then tweeted: "Roommate asked for room again. It's happening again. People with iChat, don't you dare video chat me from 9:30 to 12;" and "Everyone ignore that last tweet. Stupid drafts."

At 8:46 p.m., defendant sent T.C. the following text:

> I want to explain what happened. Sunday night when you requested to have someone over I didn't realize you wanted the room in private. I went to [M.W.'s] room and I was showing her how I set up my computer so I can access it from anywhere. I turned on my camera and saw you in the corner of the screen and I immediately closed it. I felt uncomfortable and guilty of what happened. Obviously I told people what occurred so they could give me advice. Then [T]uesday when you requested the room again I wanted to make sure what happened [S]unday wouldn't happen again. I went on twitter to let my friends know you wanted the room again and not to video chat me from 930 to 12. Just in case, I turned my camera away and put my computer to sleep so even if anyone tried it

29

wouldn't work. I wanted to make amends for [S]unday night. I'm sorry if you heard something distorted and disturbing but I assure you all my actions were good natured.

I've known you were gay and I have no problem with it. In fact one of my closest friends is gay and he and I have a very open relationship. I just suspected you were shy about it which is why I never broached the topic. I don't want your freshman year to be ruined because of a petty misunderstanding, it's adding to my guilt. You have the right to move if you wish but I don't want you to feel pressured to without fully understanding the situation.

On September 22, 2010, shortly after defendant sent this text message, T.C. wrote on his Facebook page: "I'm going to jump off the GW Bridge. Sorry."

E

## The Investigation

At 9:30 p.m. on Wednesday, September 22, 2010, Rutgers Police Officer Christopher Kowalczyk was dispatched to conduct a welfare check on T.C. Kowalczyk first went to T.C.'s dorm room, where he found defendant there alone. Defendant said his last contact with T.C. had been at about 4:35 p.m. that day, when T.C. returned from class, dropped off his backpack, and left without saying where he was going. Defendant told Kowalczyk that T.C. had a guest sleep over on Sunday night and described the man as slightly overweight with a scruffy beard. Defendant thought T.C. and the man were involved in an intimate

30

relationship.

Around 1 a.m. on Thursday, September 24, 2010, Rutgers administrators learned that T.C. had committed suicide by jumping off of the George Washington Bridge. At approximately 9 a.m. that day, the Assistant Director of the Busch Campus, a representative of the Psychology Department, and Resident Assistant Grover went to defendant's room to inform him of what had occurred. They asked defendant to contact his parents and go home for a few days.

Later that afternoon, defendant texted M.H.: "My roommate committed suicide." He told her that he would stay home "until it blows over. The cops came to my room last night looking for him. And a bunch of counselors told me this morning. . . . They're being mad helpful." When M.H. asked defendant if he knew what caused T.C. to take his own life, defendant responded: "No idea. He was quiet all the time and had no friends so I guess it makes sense." M.H. appeared surprised about defendant's statement: "I thought he had friends. <u>Didn't you say there was like a viewing party once</u> and didn't he have another guy or something?" (Emphasis added). Defendant quickly attempted to disavow his earlier tweet: "No that was a joke. I told the counselors everything that happened on Sunday and Tuesday." Defendant then asked M.H. to delete something S.X. had

posted that was negative about T.C.; M.H. agreed to do so.

Douglas Rager, who at the time was a detective with the Rutgers University Police Department, testified that on Thursday, September 23, 2010, he seized evidence from the dorm room shared by T.C. and defendant. He and Investigator Michael Daniewicz from the Middlesex County Prosecutor's Office picked M.W. up later that afternoon and took her to the Rutgers Police Department for questioning. M.W. testified that when university police officers picked her up in an unmarked car, she became nervous and told A.C. through text message that he should call the police if he did not hear from her by 10 p.m. that night. M.W. did not answer A.C.'s subsequent calls. When A.C. called defendant to find out what was happening, defendant told A.C. that he would try to contact her directly.

Defendant phoned M.W. while she was in a conference room at police headquarters. M.W. told him that she could not speak to him and hung up. Defendant then texted M.W. and the following exchange ensued. Once again, we are quoting the exchange verbatim, deliberately leaving misspellings and grammatical deviations unaltered:

> [DEFENDANT]: Did you tell them [police] we did it on purpose?
>
> [M.W.]:  Yeah. . . well that we didn't know what we were gonna see

Where is [T.C.]. . .

[DEFENDANT]: Because I said we were just messing around with the camera. He told me he wanted to have a friend over and I didn't realize they wanted to be all private.

[M.W.]:  Omg dharun why didn't u talk to me first i told them everything

[DEFENDANT]:  Like what

[M.W.]: Like literally everything bcu they asked me to tell them exactly what happened

[DEFENDANT]:  What did you tell them when they asked why we turned it on

[M.W.]:  I said we just wanted to see what was going on

[DEFENDANT]:  And you said we closed it immediately?

[M.W.]: Yes

[DEFENDANT]:  Okay.

[M.W.]: I'm scared . . .wtf is going on. . .

[DEFENDANT]:  Nothing I'm at home.

What did they tell you?

[M.W.]: What so why are [they] asking all these questions . . . and they told me nothing!

[DEFENDANT]:  Ok don't worry you're not in trouble.

Did you say anything about Tuesday because I turned off my computer that day

[M.W.]: Aiya still

[Tuesday]? Idk[14] whT happened that day

[DEFENDANT]: Nothing happened

[M.W.]: Ok LOL

[DEFENDANT]: But rumors got started

[M.W.]: Wtf?  Like what. . . and did [T.C.] find out is that why the police are asking question/s?

[DEFENDANT]: He thought people were watching him tuesday.

Investigator Daniewicz testified that about halfway through M.W.'s interview, he excused himself from the room.  When he returned, he asked M.W. when she last had contact with defendant.  She replied that she had spoken to him a few minutes earlier.  With M.W.'s consent, Daniewicz made a hard copy of her text exchange with defendant.

After questioning M.W., Rager and Daniewicz drove to the Ravi residence where they met with defendant's parents. Defendant agreed to accompany the law enforcement agents back to the Rutgers Police headquarters for further questioning.  After waiving his <u>Miranda</u>[15] rights, defendant gave the officers his cellphone and agreed to answer all of their questions.  The videotape of defendant's interrogation was played for the jury.

---

[14] "Idk" stands for "I don't know."
[15] <u>Miranda v. Arizona</u>, 384 <u>U.S.</u> 436, 444-45, 86 <u>S. Ct.</u> 1602, 1612, 16 <u>L. Ed.</u> 2d 694, 707 (1966).

In his statement, defendant downplayed the exuberance he displayed in the tweets and texts he sent and omitted the homophobic statements he candidly included in these electronic messages. He emphasized that M.B.'s age and appearance was outside the norm of a typical college student. "He didn't seem like a student here[;] he seem[ed] kind of older and he look[ed] kind of weird. Honestly, . . . I didn't know who he was, [and I was] a little worried about it."

For the first time, defendant stated that he was concerned for "his valuables." He wanted to check to make sure T.C. and his guest "were not going through his stuff." Thus, he suggested to M.W. to setup the means to watch clandestinely what was taking place behind the closed door of the dorm room. He explained that he had had his computer set up to automatically accept video chats for some time. Without reciting at length the forty-four page interrogation document, we can safely summarize its content as a poorly executed attempt by defendant to sanitize his motives for using his knowledge of computers to surreptitiously observe T.C. and M.B. engaged in sexual relations.

Defendant told the investigators that he was not aware that T.C. was reading his tweets. He suspected T.C. may have heard something, however, because he reported the matter to Resident

A-4667-11T1

Assistant Grover. Defendant claimed he deleted the September 19 and 21, 2010, tweets after Grover spoke to him on Wednesday "because otherwise they can be interpreted like ambiguously." He tweeted "stupid drafts" because he accidently sent "a draft" of the September 21, 2010 tweet when he was deleting the other two.

Timothy Edward Hayes, a security analyst with Rutgers' Information Technology Department, testified to explain how Rutgers students connect to the Internet. He examined the activity that took place on defendant's computer on September 21, 2010. Hayes also identified two iChat sessions — one with L.O.'s computer at 6:58 p.m. and one with A.A.'s computer at 7:44 p.m. Looking at activity between the hours of 7 p.m. and midnight, there was a "glaringly obvious hole in the middle" where there was no data at all from defendant's computer. The only explanation for this is that defendant's computer was turned off from about 9:25 p.m. until 11:19 p.m.

In his defense, defendant presented seven character witnesses. These witnesses consistently testified to never having heard defendant make any derogatory statements about homosexuals.

II

Against this factual record, defendant raises the following arguments:

POINT I

THE TRIAL COURT SHOULD HAVE GRANTED DEFENDANT'S MOTIONS FOR ACQUITTAL. (raised below)

A. COUNT 1, Invasion of Privacy.

B. COUNT 3, Invasion of Privacy.

C. COUNT 5, Attempted Invasion of Privacy.

D. COUNT 7, Attempted Invasion of Privacy.

E. COUNTS 2, 4, 6, and 8, Bias Intimidation.

F. COUNT 12, Hindering Apprehension.

POINT II

THE TRIAL COURT'S FINAL CHARGE TO THE JURY DEPRIVED DEFENDANT OF A FAIR TRIAL. (not raised below)

A. The court gave no limiting instruction of T.C.'s suicide.

B. The court failed to properly emphasize the State's burden of proof.

C. The separate offenses were improperly blended together.

POINT III

THE BIAS INTIMIDATION CONVICTIONS THAT ARE NOT BASED ON PURPOSEFUL CONDUCT MUST BE VACATED (counts 2 and 4). (not raised below)

POINT IV

THE TRIAL COURT'S CHARGE ON COUNTS 1 AND 5 WAS ERRONEOUS AND PREJUDICIAL. (not raised below)

POINT V

DEFENDANT SHOULD HAVE BEEN PERMITTED TO IMPEACH M.B.'S CREDIBILITY ON CROSS-EXAMINATION WITH HIS PRIOR CONVICTIONS AND FALSE CERTIFICATION. (raised below)

POINT VI

DEFENDANT WAS DENIED HIS RIGHT TO A PUBLIC TRIAL WHEN THE TRIAL COURT REFUSED TO ALLOW ARGUMENT ON M.B.'S PRIOR CONVICTIONS IN OPEN COURT. (raised below)

POINT VII

THE ADMISSION OF RAAHI GROVER'S INCIDENT REPORT, WITH T.C.'S REDACTED EMAIL, VIOLATED DEFENDANT'S RIGHT TO CONFRONTATION. (raised below)

POINT VIII

DEFENDANT WAS PREJUDICED BY THE DENIAL OF PRE-TRIAL DISCOVERY. (raised below)

    A. Complete copies of the forensic images of T.C.'s computer.

    B. All reports from the Port Authority Police Department.

    C. Copies of evidence item #11.

D. Copies of three specific documents.

POINT IX

THE INDICTMENT SHOULD HAVE BEEN DISMISSED FOR AN INADEQUATE GRAND JURY VOID [SIC] DIRE REGARDING PRETRIAL PUBLICITY. (raised below)

The bulk of our analysis will be dedicated to determining whether the evidence of T.C.'s state of mind irreparably tainted the jury's verdict as a whole. Defendant argues that all of his convictions must be vacated because they were irreparably tainted by highly prejudicial evidence admitted solely to support the charges under N.J.S.A. 2C:16-1(a)(3). Defendant points out that to meet its burden of proof under N.J.S.A. 2C:16-1(a)(3), the State presented evidence from a variety of sources that revealed the intimidation and humiliation T.C. felt as a result of defendant's conduct. Defendant asserts that "there is simply no way for this Court to conclude that such evidence did not have the clear capacity to taint all of the guilty verdicts in this case."

The State argues that the Supreme Court's holding in Pomianek does not disturb defendant's conviction on any count other than those directly predicated on N.J.S.A. 2C:16-1(a)(3) as a basis for criminal culpability. According to the State, defendant's convictions on the tampering and hindering counts,

six of which defendant did not challenge on appeal, must be affirmed. The State argues that T.C.'s state of mind, including the email to the Resident Assistant and T.C.'s incessant checking of defendant's Twitter account, were admissible independent of N.J.S.A. 2C:16-1(a)(3), because they relate to an element of the charge of invasion of privacy under N.J.S.A. 2C:14-9(a) and (c), to wit, establishing that T.C. did not consent to being viewed having sexual relations with M.B. We are not persuaded by the State's arguments.

To warrant the reversal of a jury verdict in cases in which admitted evidence implicates a constitutional right, the reviewing court must determine whether the alleged error was "harmless beyond a reasonable doubt." State v. Weaver, 219 N.J. 131, 154 (2014) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710-11 (1967)). Pomianek's holding implicates defendant's constitutional rights under the Due Process Clause of the Fourteenth Amendment because it rendered inadmissible the evidence adduced at trial relating to N.J.S.A. 2C:16-1(a)(3). Pomianek, supra, 221 N.J. at 70.

Here, the State's case was predicated on accomplishing two objectives: (1) to show defendant was a homophobic, computer savvy young man who combined these two features of his character to prey upon his socially awkward, gay roommate; and (2) to

humanize T.C. by showing how defendant's misconduct affected T.C.'s life (as described by Grover, the Resident Assistant who testified that T.C. requested a room change "ASAP," and produced evidence of T.C.'s incessant monitoring of defendant's Twitter account during the critical days preceding his death).[16] These were the twin pillars of the State's case. The Supreme Court's holding in Pomianek undermined the evidential foundation of the second pillar. Stated differently, admission of T.C.'s state of mind evidence constituted an error "of such a nature to have been clearly capable of producing an unjust result." R. 2:10-2.

The verdict sheet given to the jury by the trial court contained charges arising from the crime of second and third degree bias intimidation, defined in N.J.S.A. 2C:16-1(a)(3), as reflected in counts 2, 4, 6, and 8 of the indictment. The jury returned a verdict finding defendant guilty on all charges. N.J.S.A. 2C:16-1(a)(3) defines third degree bias intimidation as follows:

---

[16] Although not a formal part of the case, the trial judge informed all prospective jurors during voir dire that T.C. committed suicide and that defendant was not charged with either causing or contributing to his death. T.C.'s suicide was also mentioned during the course of the trial. In cross-examining M.H., defense counsel elicited testimony about texts that referred to T.C.'s suicide. The attorneys did not request that the court include a jury charge addressing T.C.'s suicide, and the trial judge did not include such a charge sua sponte as part of his charges to the jury.

A person is guilty of the crime of bias intimidation if he [or she] commits, attempts to commit, conspires with another to commit, or threatens the immediate commission of an offense specified in chapters 11 through 18 of Title 2C of the New Jersey Statutes; [N.J.S.A. 2C:33-4] [N.J.S.A. 2C:39-3]; [N.J.S.A. 2C:39-4]; or [N.J.S.A. 2C:39-5],

. . . .

(3) under circumstances that caused any victim of the underlying offenses to be intimidated and the victim, considering the manner in which the offense was committed, reasonably believed either that (a) the offense was committed with a purpose to intimidate the victim or any person or entity in whose welfare the victim is interested because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity, or (b) the victim or the victim's property was selected to be the target of the offense because of the victim's race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity.

[(Emphasis added).]

In Pomianek, the Supreme Court held that N.J.S.A. 2C:16-1(a)(3) violated the Due Process Clause of the Fourteenth Amendment because it focused "on the victim's perception and not the defendant's intent." Pomianek, supra, 221 N.J. at 70. Here, the State presented evidence that focused exclusively on T.C.'s perception of defendant's conduct, not defendant's intent. The Supreme Court explained in Pomianek the inherent

danger of permitting a jury to consider evidence that focuses only on the victim's state of mind:

> Unlike subsections (a)(1) and (a)(2), subsection (a)(3) focuses not on the state of mind of the accused, but rather on the victim's perception of the accused's motivation for committing the offense. Thus, if the victim <u>reasonably believed</u> that the defendant committed the offense of harassment with the purpose to intimidate or target him [or her] based on his [or her] race or color, the defendant is guilty of bias intimidation. <u>N.J.S.A.</u> 2C:16-1(a)(3). Under subsection (a)(3), a defendant may be found guilty of bias intimidation even if he [or she] had no purpose to intimidate or knowledge that his [or her] conduct would intimidate a person because of his [or her] race or color. In other words, an innocent state of mind is not a defense to a subsection (a)(3) prosecution; the defendant is culpable for his [or her] words or conduct that led to the victim's reasonable perception even if that perception is mistaken.

> [<u>Id.</u> at 82.]

Here, the State presented substantial evidence of T.C.'s state of mind as a means of establishing defendant's guilt. Grover's testimony in particular focused on T.C.'s demeanor on September 21, 2010, when he first had contact with him. Even after redaction, the email T.C. wrote to Grover that same evening attributes his distress to defendant's tweets. The Rutgers administrator testified that T.C. submitted a request for a room change, citing concerns about his roommate using his

webcam to spy on him. A forensic investigator testified that T.C. visited defendant's Twitter account fifty-nine times between September 13 and September 22, 2010. M.B. stated that T.C. had a "visible reaction" to the sound of laughter in the courtyard outside his room and was troubled by a gap in the window blinds that might have allowed someone to see inside. There was no evidence that defendant ever attempted to see T.C. and M.B. through a window.

The State argues that this evidence was relevant to the question of whether T.C. consented to defendant's observations of himself and M.B. under N.J.R.E. 401. The State also argues that the redacted portion of T.C.'s email was admissible under the "then existing state of mind" exception to the rule against hearsay, N.J.R.E. 803(c)(3). Even if this evidence may have had a broad relevance on such limited grounds, N.J.R.E. 402, we are satisfied that under a post-Pomianek analytical framework, the trial judge would have found under N.J.R.E. 403 that the prejudicial effect of admitting this evidence would far exceed its probative value. Ultimately, however, this is a non-issue because defendant never claimed that he had T.C.'s consent to use the webcam to watch him having sexual relations with M.B.

The trial court engaged in an N.J.R.E. 403 analysis by weighing the relevance of the evidence as it related to the

N.J.S.A. 2C:16-1(a)(3) charges, but it did not balance the probative value of the evidence under N.J.S.A. 2C:14-9. If it had, it is highly unlikely that it would have found the evidence admissible because defendant has never claimed he had consent as an affirmative defense to the charge of invasion of privacy. Defendant has never claimed that T.C. was aware that the webcam was transmitting video from inside the room. M.W.'s testimony that she and defendant viewed T.C. surreptitiously was uncontroverted.

It is undisputed that constitutionally defective evidence of T.C.'s state of mind permeated the State's entire case against defendant. Indeed, this evidence was one of the focal points of the prosecutor's summation to the jury.

> Now . . . we come to [T.C.]. You hear about the fact that [T.C.] at some point starts to go on to the defendant's Twitter page[,] and in the course of going on the defendant's Twitter page at various points in time, . . . what does he discover? He discovers . . . the tweet from the 19th, [September 2010], the tweet that said ["]roommate asked for room.["] And when he finds that tweet[,] what does he do? You hear from Bill O'Brien from the Rutgers University Housing Department that at 3:55 a.m.[,] [T.C.] has filed an online room change request through the automated system. So just a little while after viewing that tweet and discovering it[,] he makes an online request for a room change. He also discovers [at] about 9:15 that night -- just a little bit before his guest M.B. is going to arrive -- the tweet from that evening,

the tweet that's sent out after he texted his roommate again and asks for . . . permission to use the room . . . for some private time. And the defendant tells him[,]["][Y]eah, no problem.["] He finds out about that second tweet.

And I suggest to you, ladies and gentlemen, the online room change request at that point was not going to be something that was good enough -- not something that he could wait for. So what does he do? He goes to see one of the resident assistants at the dorm. And you heard from that resident assistant, Raahi Grover, who came in here and testified. He tells you about [T.C.][,] who he doesn't really know that well. . . . But [T.C.] shows up at his room. And what does he tell you about [T.C.]'s demeanor at that point? He tells you he seems uncomfortable[;] he seems to be upset about the information . . . and [he] makes a request . . . for a room change. Raahi Grover was a resident assistant at Rutgers University for three years[.] [H]e told you . . . he never had encountered . . . a situation like this[,] and because of that situation[,] he asks [T.C.] to put in his own words what he had just told him [and to] send it to him in an email so that he can put it into a report that he then . . . choose[s] to file . . . with his supervisors so that immediate action can be taken. <u>And he tells you in his own words, in his own thoughts, that once he hears what [T.C.] tells him[,] he wants the situation to be brought to his supervisor's attention. He wants that situation to be escalated . . . because he knew the seriousness of it, and he files that incident report form and part of that incident report form has [T.C.]'s own words[:] "I feel that my privacy has been violated and I am extremely uncomfortable sharing a room with someone who would act in this manner." And then Raahi Grover puts down at the bottom, as included in his incident report, ["][T.C.]</u>

A-4667-11T1

is quite upset and feels uncomfortable. [T.C.] prefers a roommate switch ASAP and would like to see [some] sort of punishment for Dharun Ravi.["]

. . . .

I just want to go back for a moment, ladies and gentlemen, to the screen shots that you saw about those Twitter messages. Remember that you heard testimony that the computer of [T.C.] was examined and that's where those screen shots were found. Those [shots] were taken by [T.C.] to memorialize what he saw on the Twitter page. So I ask you to think about . . . when [T.C.] first viewed . . . the first Twitter message that he saw. He saw that at approximately one o'clock in the morning when he took the screen shot. Maybe he saw it sometime before and then decided to take the screen shot later.

Think about the situation of [T.C.]. You've heard just about every person that's come into this courtroom to testify that [T.C.] was quiet[;] he was shy. Maybe he wasn't as social as the kids [who] hung out in the lounge, the kids [who] played pool, [or] the kids [who] all went to the dining hall together. Three weeks into his college experience[,] and he finds out that his sexual orientation has been broadcast to the defendant's Twitter followers. He finds out his private sexual activity has been exposed. He knows it's been exposed. It's been exposed at least to [M.W.]. It's been exposed by words in that tweet. And what do you think he's thinking? If [M.W.] saw it[,] did [C.C.] see it? Did other people [i]n that hallway see it? Did people on the other side of Davidson C see it? Did other people [who] hang out in the lounge come down and see it? You don't think that he was intimidated by learning that information[?] [F]earful[?] [E]mbarrassed? He'd been exposed[.] [N]ot only his being,

47
A-4667-11T1

> his identity, his sexual orientation, but his private sexual activity was exposed also. And then . . . you go back to that . . . documentation about how many times he checked that Twitter page from September 13th till the 19th. . . . What was he checking for?
>
> [(Emphasis added.)]

As this lengthy verbatim recitation of the prosecutor's closing argument to the jury shows, the second pillar of the State's case expressly relied on evidence describing the victim feeling humiliated and embarrassed as indicative of defendant's state of mind; the suggested inference is that defendant must have acted with the intent to intimidate because the evidence shows T.C. in fact felt embarrassed and humiliated. It would be unreasonable to conclude that this evidence, coupled with the prosecutor's strong and eloquent remarks, did not have the clear capacity to produce an unjust result.

Reversing a jury verdict based on "trial error 'implies nothing with respect to the guilt or innocence of the defendant' but rather 'is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect.'" State v. Gibson, 219 N.J. 227, 244 (2014) (quoting Burks v. United States, 437 U.S. 1, 15, 98 S. Ct. 2141, 2149, 57 L. Ed. 2d 1, 12 (1978)). The standard that governs our review of all criminal trials is fairness. "A

defendant is entitled to a fair trial but not a perfect one." State v. R.B., 183 N.J. 308, 334 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619, 73 S. Ct. 481, 492, 97 L. Ed. 593, 606 (1953)).

The case against defendant in this trial was replete with evidence presented by the State to support the charges of bias intimidation under N.J.S.A. 2C:16-1(a)(3). The State asked the jury to return a guilty verdict as to all fifteen counts in the indictment. The jury deliberated and returned a unanimous verdict guided by then legally sound instructions given by the judge. Any attempt to filter out the influence exerted by the evidence pertaining to N.J.S.A. 2C:16-1(a)(3) would be as futile as using a cloth strainer to remove the adulteration caused when a tablespoon of ink is dropped into a glass of milk. We can never be reasonably confident that the verdict produced was free from the adulterated influence of the inadmissible evidence.

### III

#### A

#### Hindering Apprehension

Defendant argues that the trial judge erred in denying his motion for a judgment of acquittal on Count 12, charging him with second degree hindering apprehension in violation of N.J.S.A. 2C:29-3(b)(3), because the State failed to present

competent evidence showing that the texts messages sent by defendant affected the information M.W. gave to the law enforcement officers who questioned her that day.

The hindering apprehension charge reflected in Count 12 is predicated on the texts exchanged between M.W. and defendant on September 23, 2010. On that day, M.W. was picked up by Rutgers University Detective Rager and Middlesex County Prosecutor Investigator Daniewicz and transported to the Rutgers Police Department for questioning. Defendant also argues the trial court erred by allowing the State to rely on these same facts to charge defendant under Count 14 with third degree witness tampering, as defined in N.J.S.A. 2C:28—5(a)(1) and/or (2).

Defendant raised these two legal issues in pretrial motions and after the State rested its case in the form of a motion for a Judgment of Acquittal, pursuant to Rule 3:18-1. In denying defendant's motion, the trial judge made the following statement:

> [Y]ou theoretically can hinder something before you're aware of an investigation. And in theory, once you're aware it's been launched or initiated, you can tamper with it.
> Having said that, it also seems to me that the same course of conduct underlies both charges. It seems to me that's really an issue of merger at a later point. But at this point I think they both have to survive.

50                                                      A-4667-11T1

We disagree.  Counts 12 and 14 were both based on the text exchange that occurred between defendant and M.W. on September 23, 2010, while M.W. was in an interrogation room at the Rutgers Police Department.  We have described in detail the confluence of events that led defendant to text M.W. while she was still in the headquarters of the University Police.  The record shows, and the State does not dispute, that the exchange of text messages between M.W. and defendant occurred after M.W. had given her statement to the law enforcement investigators.

Through these text messages, defendant asked M.W. what she had told the police and suggested that she characterize what he did to his laptop webcam as merely "messing around with the camera."  According to defendant, T.C. "wanted to have a friend over and [he] didn't realize they wanted to be all private."  However, M.W. made clear to defendant that she had told the police interrogators all that occurred on Sunday night, September 19, 2010.  Stated in the vernacular of this form of electronic communication, M.W. stated the following:

> I told them everything . . . Like literally
> everything bcu (sic) they asked me to tell
> them exactly what happened.

Defendant then brought up the events of Tuesday night, September 21, 2010 and suggested that M.W. tell the investigators: "I turned off my computer that day."  M.W. replied that she did not

51

know anything about Tuesday night. Again, quoting her actual words, M.W. stated, "Idk whT happened that day[.]"

At trial, M.W. testified that everything she told the law enforcement investigators on September 23, 2010, was the truth. Defendant's text messages did not have any effect on M.W.'s account of the events that occurred that day; nor did defendant's texts influence the manner in which she described those events. M.W. also emphasized that she did not know anything about what occurred on Tuesday night. In fact, she was not certain if the interrogating investigators even brought up any occurrence related to Tuesday, September 21, 2010.

Count 12 charged defendant with second degree hindering apprehension in violation of N.J.S.A. 2C:29-3(b)(3), which provides:

> A person commits an offense if, with purpose to hinder his [or her] own detention, apprehension, investigation, prosecution, conviction or punishment for an offense or violation of Title 39 of the Revised Statutes or a violation of chapter 33A of Title 17 of the Revised Statutes, he [or she] . . .
>
> [p]revents or obstructs by means of force, intimidation or deception any witness or informant from providing testimony or information, regardless of its admissibility, which might aid in his [or her] discovery or apprehension or in the lodging of a charge against him [or her.]

Section (b) was added to N.J.S.A. 2C:29-3 by L. 1981, c. 290, § 29 as a direct response to the threat of violence against potential witnesses by organized crime. Cannel, Current N.J. Criminal Code Annotated, comment 3 on N.J.S.A. 2C:29-3 (2016). For that reason, N.J.S.A. 2C:29-3(b)(3) adds the requirements of force, intimidation, or deception to the elements of witness tampering set forth in N.J.S.A. 2C:29-3(a)(3). State v. Krieger, 285 N.J. Super. 146, 152-53 (App. Div. 1995).

> It is surely a matter of common experience that people charged or expecting to be charged with [a] crime will seek assistance from those who may have relevant knowledge. A mere request for investigational or testimonial assistance ought not to be criminalized on the basis that it might be construed as an effort to suppress evidence of a crime.

> [Id. at 152.]

Here, the State does not claim, and the evidence presented at trial did not show, that defendant exerted any force or intimidation on M.W. Although the State argues that his texts constituted deception, the only potentially false statement that defendant made was his claim to have shut his computer off on Tuesday night. This is not the type of "deception" the statute seeks to penalize. The press release accompanying the passage of L. 1981, c. 290, § 29 explained that it "'[e]stablishes a new crime for any person who attempts to hinder his [or her] own

apprehension, prosecution or conviction by concealing evidence, intimidating witnesses, or by <u>giving false information to a police officer</u>.'"  <u>State v. D.A.</u>, 191 <u>N.J.</u> 158, 169 (2007) (first alteration in original) (emphasis added and omitted) (quoting <u>Press Release</u>, Acting Governor Joseph P. Merlino, Senate Bill No. 1537 (Sept. 24, 1981)).

Even if we were to view defendant's characterizations of his conduct as misleading or outright false, his communications were directed at M.W., not the police.  Furthermore, because defendant was not a member of organized crime, his text messages were not the type of misconduct that the statute seeks to deter or prevent.  <u>See</u> <u>State v. Meinken</u>, 10 <u>N.J.</u> 348, 352 (1952) (holding that courts should read statutes in relation to the mischief and evil sought to be suppressed in order to give effect to terms in accordance with their fair and natural meaning).  Defendant's texts primarily sought assistance and information from M.W., who had knowledge of the investigation. Defendant's conduct, therefore, does not fall under the misconduct proscribed by <u>N.J.S.A.</u> 2C:29-3(b)(3).  <u>Krieger</u>, <u>supra</u>, 285 <u>N.J. Super.</u> at 152.

To convict defendant under <u>N.J.S.A.</u> 2C:29-3(b)(3), the State is required to prove that he prevented or obstructed M.W. from providing the police with information that would aid in his

prosecution. Our analysis, guided by the long-settled standards established by the Supreme Court in State v. Reyes, 50 N.J. 454, 459 (1967), and codified in Rule 3:18-1, requires us to determine

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

We are satisfied that defendant is entitled to a judgment of acquittal as a matter of law because the record developed at trial is devoid of any evidence to support the jury's guilty verdict on Count 12, charging defendant with second degree hindering apprehension in violation of N.J.S.A. 2C:29-3(b)(3).

### B

### Witness Tampering

Count 14 charged defendant with third degree tampering with a witness, in violation of N.J.S.A. 2C:28-5(a)(1) and/or (2), which provides:

> A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted or has been instituted, he [or she] knowingly engages in conduct which a reasonable person would believe would cause a witness or informant to:
>
> (1) Testify or inform falsely;

> (2) Withhold any testimony, information, document or thing[.]

In <u>D.A.</u>, <u>supra</u>, 191 <u>N.J.</u> at 169, the Court compared the hindering statute, <u>N.J.S.A.</u> 2C:29-3(b), with the tampering statute, <u>N.J.S.A.</u> 2C:28-5. Writing on behalf of a unanimous Court, Justice Long explained:

> [T]hough both the tampering statute, <u>N.J.S.A.</u> 2C:28-5, and the hindering statute, <u>N.J.S.A.</u> 2C:29-3, broadly proscribe the suppression of evidence, there is a fundamental difference between them. <u>N.J.S.A.</u> 2C:29-3 prohibits such suppression at any point prior to a defendant forming a belief that an official action has been or is about to be instituted. Unlike <u>N.J.S.A.</u> 2C:28-5, <u>N.J.S.A.</u> 2C:29-3 is phrased in terms of avoiding discovery, apprehension, or the lodging of a charge. For that reason, it is also associated in the Code with escape, eluding, resisting, flight, and physical interference, all of which constitute efforts by a defendant to stay out of the official cross-hairs of law enforcement, without necessarily believing that official action exists or is contemplated. On the contrary, <u>N.J.S.A.</u> 2C:28-5 addresses action taken <u>after</u> one is already the <u>focus</u> of, or <u>believes he may be the focus</u> of, an official proceeding.
>
> That distinction is important. The conduct that hindering addresses is the wrongful avoidance of an official action by attempting to prevent a witness from reporting a crime to the police; the conduct that is the focus of tampering is the wrongful interference with an official action that defendant believes has begun or is about to begin.

[<u>D.A.</u>, <u>supra</u>, 191 <u>N.J.</u> at 169-70 (Emphasis added).]

The temporal distinction between the tampering statute and the hindering statute is a key factor here. While it is possible for a defendant to be charged with violation of both statutes, the two violations cannot be based on a single, temporally discrete act. A defendant can be charged with hindering apprehension for intimidating a witness before any investigation is underway, and thereafter charged with witness tampering based on conduct committed after the investigation is pending, inducing a witness to testify falsely. But a defendant cannot be charged with both crimes based on a single discrete act. Count 12 and Count 14 are both factually predicated on defendant's text messages to M.W. on September 23, 2010. This discrete conduct cannot legally support convictions under both Counts 12 and 14.

In order to establish the requisite state of mind to transform the suppression of evidence from hindering to tampering, the State must prove that "defendant was aware of facts that would lead a reasonable person to believe that an official action was pending or about to be instituted." <u>Id.</u> at 170. Here, there was ample evidence showing that defendant was aware of pending official action when he contacted M.W. on September 23, 2010. Grover informed defendant on September 22,

2010, that an incident report had been filed concerning allegations made by T.C. and that defendant would be hearing from senior management about the matter. Later that evening, a police officer came to defendant's dorm room inquiring as to T.C.'s whereabouts. The next morning, counselors and administrators informed defendant that T.C. had committed suicide and directed him to go home. That evening, A.C. phoned defendant to tell him that M.W. had been picked up by the police. When defendant called M.W. on her cellphone, she told him that she could not speak to him because she was at the University Police Headquarters. Thus, at the time defendant sent his text to M.W., he was well aware that an official investigation was underway. Under the Court's reasoning in D.A., defendant should have been charged only with witness tampering, contrary to N.J.S.A. 2C:28-5(a)(1) or (2). Based on the facts we have described, there is no legal basis to charge defendant of hindering apprehension under N.J.S.A. 2C:29-3(b)(3). There was, however, sufficient evidence to convict defendant of tampering.

IV

Conclusion

This case has understandably received a great deal of media attention. Defendant was convicted of multiple counts of

invasion of privacy, bias intimidation, hindering prosecution, and tampering with evidence. His criminal conduct was directed against his then college roommate, T.C., and M.B., a man T.C. invited to his dorm room on two occasions to engage in intimate and indisputably private sexual activity. The State's case was based on defendant's opprobrium of T.C.'s sexual orientation. The State alleged that defendant used his technological prowess to effectively convert the video webcam attached to his desktop computer into the functional equivalent of an electronic peephole. Thereafter, defendant adroitly used social media tools to disseminate the time he planned to spy on T.C, as well as broadcast (or attempt to broadcast) a live video feed of T.C. having consensual sexual relations with a male guest in the dorm room he shared with defendant.

Tragically, T.C. committed suicide after he discovered defendant's voyeuristic machinations. The sense of loss associated with a young man taking his own life defies our meager powers of reason and tests our resolve to seek consolation. From a societal perspective, this case has exposed some of the latent dangers concealed by the seemingly magical powers of the internet. The implications associated with the misuse of our technological advancements lies beyond this court's competency to address.

Defendant was not charged with causing or contributing to T.C.'s death. However, the social environment that transformed a private act of sexual intimacy into a grotesque voyeuristic spectacle must be unequivocally condemned in the strongest possible way. The fact that this occurred in a university dormitory, housing first-year college students, only exacerbates our collective sense of disbelief and disorientation. All of the young men and women who had any association with this tragedy must pause to reflect and assess whether this experience has cast an indelible moral shadow on their character.

Pursuant to the Supreme Court's decision in Pomianek, supra, 221 N.J. at 69, defendant's convictions on Counts 2, 4, 6, and 8, which charged him with third degree bias intimidation, as reflected in Middlesex County Indictment No. 11-04-00596 and prosecuted pursuant to N.J.S.A. 2C:16-1(a)(3), are vacated and defendant's charges are dismissed with prejudice as a matter of law. As we have explained in Section III herein, the conviction under Count 12 for second degree hindering apprehension contrary to N.J.S.A. 2C:29-3(b)(3) must be vacated as a matter of law and the charge dismissed with prejudice for insufficiency of evidence. R. 3:18-1. Finally, we conclude that the evidence the State presented to prove the charges in Counts 2, 4, 6, and 8 tainted the jury's verdict on the remaining charges, depriving

defendant of his constitutional right to a fair trial.  We are compelled to remand the matter for a new trial on Counts 1, 3, 5, 7, 9, 10, 11, 13, 14, and 15.

Reversed and remanded.  We do not retain jurisdiction.  The State's cross-appeal challenging the sentence imposed by the trial court is moot.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

61                                          A-4667-11T1